**UNITED STATES DISTRICT COURT**

**CENTRAL DISTRICT OF CALIFORNIA**

| | | |
|---|---|---|
| TASCHE E., | ) | NO. ED CV 19-1829-E |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | **MEMORANDUM OPINION** |
| | ) | |
| ANDREW SAUL, Commissioner of | ) | **AND ORDER OF REMAND** |
| Social Security, | ) | |
| | ) | |
| Defendant. | ) | |
| _____ | ) | |

Pursuant to sentence four of 42 U.S.C. section 405(g), IT IS HEREBY ORDERED that Plaintiff's and Defendant's motions for summary judgment are denied, and this matter is remanded for further administrative action consistent with this Opinion.

**PROCEEDINGS**

Plaintiff filed a complaint on September 24, 2019, seeking review of the Commissioner's termination and denial of disability benefits. The parties consented to proceed before a United States Magistrate Judge on November 5, 2019.  Plaintiff filed a motion for summary

judgment on February 26, 2020.  Defendant filed a motion for summary judgment on March 27, 2020.  The Court has taken the motions under submission without oral argument.  See L.R. 7-15; "Order," filed September 26, 2019.

**BACKGROUND**

Plaintiff was found disabled as of May 1, 2008, because of major depressive disorder (Administrative Record ("A.R.") 31, 35, 126-28). Subsequently, the Administration found that Plaintiff had medically improved such that, as of November 1, 2014, Plaintiff supposedly was no longer disabled[1] (A.R. 31, 126).

On February 18, 2016, an Administrative Law Judge ("ALJ") heard testimony from Plaintiff and a vocational expert (A.R. 90-120). Plaintiff was not then represented (id.).  In a decision dated March 16, 2016, the ALJ agreed that Plaintiff's disability supposedly had ended as of November 1, 2014 (A.R. 126-34).  Specifically, the ALJ found that: (1) Plaintiff did not develop any additional impairments beyond major depressive disorder through November 1, 2014;[2] (2) Plaintiff's depression medically improved as of November 1, 2014; and (3) Plaintiff had a residual functional capacity to perform work at all levels of exertion, limited to simple, routine, repetitive

---

[1]   See 20 C.F.R. § 404.1594(f) (eight step sequential evaluation process to assess continued disability).

[2]   Plaintiff had testified at the February, 2016 hearing that she also had fibromyalgia, carpal tunnel syndrome and back pain (A.R. 100, 104).

tasks, with incidental contact with coworkers and no public contact (A.R. 128-32).[3]  The ALJ found that a person with this capacity could perform work existing in significant numbers in the national economy (A.R. 132-34 (adopting vocational expert testimony at A.R. 115-16)).

Plaintiff appealed the ALJ's decision and also filed new applications for disability insurance benefits and supplemental security income (A.R. 54, 58-59).  Plaintiff alleged disability based on major depression, bilateral carpal tunnel syndrome, right lateral epicondylitis, fibromyalgia and bilateral ulnar neuropathy (A.R. 305).

The Appeals Council vacated the ALJ's March 16, 2016 decision and remanded the matter for an ALJ to: (1) consider the severity or effects of Plaintiff's mental impairment under 20 C.F.R. § 404.1520a; (2) provide rationale with specific references to the medical evidence in support of assessed limitations per Social Security Ruling 96-8p, and evaluate treating/examining source opinions per 20 C.F.R. § 404.1527, requesting further evidence and/or clarification from those sources "as appropriate"; and (3) obtain supplemental evidence from a vocational expert, if warranted by the expanded record (A.R. 54-55). The Appeals Council ruled that there was "no support" for the ALJ's residual functional capacity assessment because the ALJ's decision

_____

[3]     In assessing this residual functional capacity, the ALJ reportedly did not give great weight to the state agency physicians' opinions, gave little weight to an opinion from treating psychiatrist Dr. Harry Lewis and gave no weight to treating physician Dr. Karen Keiko Murata's opinion regarding Plaintiff's physical impairments (A.R. 131).  As discussed in the medical record summary herein, it appears that none of these opinions are included in the Administrative Record presently before the Court.

1   assertedly lacked an evaluation of the mental impairment's severity or
2   a rationale for the limitations assessed (A.R. 54).

3

4       On February 14, 2018, a new ALJ heard testimony from Plaintiff
5   and a vocational expert (A.R. 56-89).   Plaintiff then was represented
6   by counsel (id.).[4]   At the hearing, the ALJ stated that he was not
7   bound by the prior ALJ's determination, which the ALJ erroneously
8   believed had been based on a finding that Plaintiff had performed
9   substantial gainful activity (A.R. 59-60).   On June 6, 2018, the ALJ
10  issued a decision purportedly addressing the Appeals Council's remand
11  order and Plaintiff's new applications for benefits (A.R. 31-46).
12  Although the Appeals Council had vacated the prior ALJ's decision, and
13  had ruled specifically that there had been "no support" for the prior
14  ALJ's residual functional capacity assessment, the new ALJ deemed the
15  prior ALJ's decision to be res judicata through the March, 2016 date
16  of that decision (A.R. 31).[5]   Even so, the new ALJ also found "changed
17  circumstances" because Plaintiff then had "more functional limitations
18  than she did when the case was considered by [the prior ALJ]" (A.R.
19  31).   The new ALJ went on to find: (1) Plaintiff's disability had

20

21  _____

22      [4]   The ALJ's ensuing decision erroneously states that
    Plaintiff was not represented at the February 14, 2018 hearing
23  (A.R. 32).

24      [5]   "[T]he Commissioner may not apply res judicata where
    the claimant raises a new issue, such as the existence of an
25  impairment not considered in the previous application. . . .  Nor
    is res judicata to be applied where the claimant was
26  unrepresented by counsel at the time of the prior claim."  Lester
    v. Chater, 81 F.3d 821, 827-28 (9th Cir. 1995) (citation
27  omitted).  Both of these conditions apply in the present case.
    Thus, the new ALJ would have erred by invoking res judicata, even
28  if the Appeals Council had not vacated the prior decision.

ended on November 1, 2014; and (2) Plaintiff had not become disabled again since that date (A.R. 32-46).

Specifically, the ALJ found that, after November 1, 2014: (1) Plaintiff has had severe bilateral carpal tunnel syndrome, bilateral epicondylitis, bilateral ulnar neuropathy, lumbar back pain, cervical stenosis, affective disorder, anxiety disorder and obesity (A.R. 35, 38);[6] (2) Plaintiff's previously disabling depression medically improved, as reportedly evidenced by her mental status examinations and activities of daily living (A.R. 37-38);[7] (3) Plaintiff had a residual functional capacity to perform light work, limited to the following: frequently pushing and pulling with the bilateral upper and lower extremities, occasionally climbing ramps and stairs, no climbing ladders, ropes, or scaffolds, occasionally balancing, stooping, kneeling, crouching, and crawling, frequently

---

[6]    The ALJ acknowledged that the record also notes fibromyalgia, sickle cell traits, cholelithiasis, "allegories" [allergies] and tendinitis of the left ankle, which the ALJ found nonsevere (A.R. 36, 38-39).  According to the ALJ, there was insufficient evidence to find that fibromyalgia is a severe impairment per American College of Rheumatology guidelines (A.R. 39; see also A.R. 142 (state agency physician's finding that Plaintiff did not meet criteria for fibromyalgia by history or examination)).

[7]    The ALJ cited "Exhibit 7E, CDR file" which appears to have been a function report completed by Plaintiff.  See A.R. 38, 43; see also A.R. 129 (prior ALJ's decision citing same, which reportedly stated that Plaintiff was able to care for her personal needs, cook and do laundry).  The function report referenced in both of the ALJs' decisions is not included in the Administrative Record.  In fact, whatever comprised the "CDR file" (or "CRD file" as it is also referenced in the most recent decision) apparently is entirely missing from the Administrative Record.

handling and fingering with the bilateral hands, no concentrated

exposure to extreme cold, no moderate exposure to hazards, and no

fast-paced work, but she can maintain concentration, persistence and

pace for simple, routine and repetitive tasks with no interaction with

the general public, no jobs that require teamwork, and low demand work

settings consistent with simple work and gradual changes in the work

setting (A.R. 38-44 (giving great weight to the state agency medical

consultants' opinions at A.R. 167-79, and little weight to the other

medical opinion evidence (not included in the record) that the prior

ALJ had considered and rejected[8])); and (4) Plaintiff has been unable

to perform her past relevant work as a secretary, but she has been

able to perform other jobs existing in significant numbers in the

national economy (A.R. 44-46 (adopting vocational expert testimony at

A.R. 80-86)).[9]

On May 4, 2019, the Appeals Council denied review (A.R. 10-15).

The Appeals Council considered a Mental Impairment Questionnaire from

Dr. Sajak Mahta dated July 19, 2018 (A.R. 22-27), but found that the

_____

[8]   See A.R. 44 (citing other exhibits from the missing
"CDR file," apparently March, 2015 state agency medical
consultants' opinions, as well as referenced opinions from
treating physicians Drs. Murata and Lewis).

[9]   Although the Administration had not ordered any
consultative examinations and the ALJ did not seek the opinion of
a medical expert, the ALJ said he thought he had "enough evidence
to make an opinion" (see A.R. 63-64, 88).  The ALJ did not
develop the record by requesting additional evidence or
clarification from Plaintiff's treating sources concerning the
bases for their opinions, as suggested in the Appeals Council's
remand order.  See id. (ALJ discussing same at the hearing and
declining counsel's request for a continuance to obtain a medical
source statement).

opinions expressed therein did not relate to the time period at issue (A.R. 11).[10]

## STANDARD OF REVIEW

Under 42 U.S.C. section 405(g), this Court reviews the Administration's decision to determine if: (1) the Administration's findings are supported by substantial evidence; and (2) the Administration used correct legal standards. See Carmickle v. Commissioner, 533 F.3d 1155, 1159 (9th Cir. 2008); Hoopai v. Astrue, 499 F.3d 1071, 1074 (9th Cir. 2007); see also Brewes v. Commissioner, 682 F.3d 1157, 1161 (9th Cir. 2012). Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Richardson v. Perales, 402 U.S. 389, 401 (1971) (citation and quotations omitted); see also Widmark v. Barnhart, 454 F.3d 1063, 1066 (9th Cir. 2006).

If the evidence can support either outcome, the court may not substitute its judgment for that of the ALJ. But the

---

[10] Dr. Mahta completed the questionnaire on behalf of treating psychiatrist Dr. Williams, whom Plaintiff had visited on June 12 and July 2, 2018 (A.R. 22, 27). Dr. Mahta diagnosed major depressive disorder (severe, recurrent), generalized anxiety disorder and chronic pain, and reported "poor response" to treatment with a "guarded" prognosis (A.R. 22). Dr. Mahta indicated Plaintiff is "seriously limited" (i.e., has noticeable difficulty for 11-20 percent of a work day or work week) in Plaintiff's ability to maintain attention for two hour segments, make simple work-related decisions, deal with normal work stress, and set realistic goals or make plans independently of others (A.R. 24-25). The vocational expert had opined that, if a person were off task more than 10 percent of a workday, employment would be precluded (A.R. 87).

> Commissioner's decision cannot be affirmed simply by
> isolating a specific quantum of supporting evidence.
> Rather, a court must consider the record as a whole,
> weighing both evidence that supports and evidence that
> detracts from the [administrative] conclusion.

Tackett v. Apfel, 180 F.3d 1094, 1098 (9th Cir. 1999) (citations and quotations omitted).

Where, as here, the Appeals Council "considers new evidence in deciding whether to review a decision of the ALJ, that evidence becomes part of the administrative record, which the district court must consider when reviewing the Commissioner's final decision for substantial evidence." Brewes v. Commissioner, 682 F.3d at 1163. "[A]s a practical matter, the final decision of the Commissioner includes the Appeals Council's denial of review, and the additional evidence considered by that body is evidence upon which the findings and decision complained of are based." Id. (citations and quotations omitted).[11] Thus, this Court has reviewed the evidence submitted for the first time to the Appeals Council.

///

---

[11]   And yet, the Ninth Circuit sometimes had stated that there exists "no jurisdiction to review the Appeals Council's decision denying [the claimant's] request for review." See, e.g., Taylor v. Commissioner, 659 F.3d 1228, 1233 (9th Cir. 2011); but see Smith v. Berryhill, 139 S. Ct. 1765 (2019) (court has jurisdiction to review Appeals Council's dismissal of request for review as untimely); see also Warner v. Astrue, 859 F. Supp. 2d 1107, 1115 n.10 (C.D. Cal. 2012) (remarking on the seeming irony of reviewing an ALJ's decision in the light of evidence the ALJ never saw).

**DISCUSSION**

Plaintiff contends, <u>inter alia</u>, that the ALJ should have developed the record to obtain a treating or examining opinion regarding Plaintiff's mental residual functional capacity, rather than giving great weight to the non-examining state agency reviewer's October, 2016 opinion.  <u>See</u> Plaintiff's Motion at 4-6.  Plaintiff also contends that the ALJ improperly used his own lay judgment to fill in the gaps in the record to reach a residual functional capacity determination.  <u>Id.</u> at 5.  For the reasons discussed below, the Court agrees.  On the current record, substantial evidence does not support the ALJ's residual functional capacity determination.

**I.   Summary of the Relevant Medical Record**

The medical record, which includes a decade of treatment documents from Kaiser Permanente, is extraordinarily voluminous. However, the inclusion of multiple copies of identical documents accounts for some of this volume.  Plaintiff reportedly was diagnosed with, <u>inter alia</u>, cholelithiasis, panic disorder and major depressive disorder (recurrent, job related) in 2003, gastroesaphageal reflux disease ("GERD") and obesity in 2004, carpal tunnel syndrome in 2005, sickle cell trait in 2008, morbid obesity in 2013, major depressive disorder (moderate, recurrent) in January of 2015, and carpal tunnel syndrome, chronic low back, thoracic pain, fibromyalgia, right elbow lateral epicondylitis, and right upper extremity ulnar nerve lesion in February of 2016 (A.R. 339, 362).

///

A. **Mental Health Treatment Records from the Alleged Onset Date through the State Agency Physicians' Review in October of 2016**

Plaintiff was found disabled due to major depressive disorder as of May of 2008, when she delivered a baby who died after only six days of life (A.R. 1045, 1054).  By November of 2008, Plaintiff was in counseling and taking Risperdal, Clonazepam and Imipramine (A.R. 1150).  Plaintiff pursued somewhat regular psychiatric treatment with Dr. Harry Lewis in 2011 and into 2012, when her mental status examinations reportedly were largely normal, apart from depressed mood, and her Global Assessment of Functioning ("GAF") scores reportedly fell in the 51-60 range (A.R. 1706-10, 1803-04, 1852-53, 1863-65, 1905-06, 1916-17, 1958-59).[12]

In July of 2013, Plaintiff said she had stopped taking her depression medication and wanted an appointment for counseling because she was under a lot of stress (A.R. 2430).  She made an appointment for August of 2013, but it appears that she did not keep the appointment (A.R. 2430, 2440, 2445).  When Plaintiff followed up with her primary care doctor, Dr. Sangeeta Aggarwal, for left ankle pain in March of 2014, she reportedly felt her depression was stable, and she

---

[12] The GAF scale is used by clinicians to report an individual's overall level of functioning.  See American Psychological Association, Diagnostic and Statistical Manual of Mental Disorders 34 (4th ed. 2000) ("DSM").  A GAF of 51-60 indicates "[m]oderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks) or moderate difficulty in social, occupational, or school functioning (e.g., temporarily falling behind in schoolwork)."  Id.

was not then taking any depression medication or interested in medications or counseling (A.R. 2544). However, in an April, 2014 phone call, Plaintiff said that she was so depressed she was having suicidal thoughts (A.R. 2581-83). The police were dispatched for a wellness check (id.). Plaintiff asked for a medication evaluation for her depression (A.R. 2592).

In July of 2014, Plaintiff presented to Dr. Alejandra Clark for an initial psychiatric evaluation (A.R. 2641-48). Plaintiff reportedly had not taken drugs for her depression in over a year, but wanted to restart medication (Celexa and Risperidone) (A.R. 2641). On mental status examination, Plaintiff reportedly was anxious, depressed and irritable, with a congruent mood and otherwise normal findings (A.R. 2644). Dr. Clark diagnosed major depression (recurrent, moderate) and prescribed Celexa and therapy (A.R. 2644-45).[13]

Plaintiff followed up with Dr. Clark in September of 2014, reporting that her symptoms had mildly improved with medication and saying that her depressed mood and anxiety were "less intense" (A.R. 2696). On mental status examination, Plaintiff reportedly had an anxious and depressed mood that was improving (A.R. 2696-97). Dr.

---

[13]     Plaintiff had presented to a social worker earlier the same day, reporting that she has had insomnia, anhedonia, crying spells, low energy, low motivation, isolation/withdrawal and panic attacks since 2008 (A.R. 2623-24). Although Plaintiff had been seeing a psychiatrist since 2003, the record reportedly reflected "very poor attendance" and no inpatient treatment (A.R. 2624). On mental status examination, she reportedly had restricted, tearful affect, anxiety and depression (A.R. 2626-27). She was assigned a GAF score of 50-55 and a highest estimated GAF for the past 12 months of 55-60 (A.R. 2627).

Clark believed Plaintiff's depression was then "in partial remission" (A.R. 2698).  Dr. Clark continued Plaintiff's medications and therapy (id.).

A note from Dr. Lewis, dated November 12, 2014, states: "Let patient know that since I have not seen her since 1/31/12 I am not able to provide a letter stating how she has been doing since then and currently" (A.R. 2772).  Plaintiff reportedly had requested a letter for the Social Security Administration stating that she was not capable of performing her regular job duties (A.R. 2772, 2783-84).

In January of 2015, Plaintiff presented to Dr. Aggarwal, reporting that her depression was not well controlled (A.R. 2795). Plaintiff also followed up with Dr. Lewis, complaining that Celexa was not sufficiently helping her mood (A.R. 2823).  On mental status examination, Plaintiff reportedly was depressed with a congruent affect (A.R. 2824).  Dr. Lewis increased Plaintiff's Celexa and referred her for therapy (A.R. 2824).

In February of 2015, Plaintiff returned to Dr. Lewis, reporting continued stressors (A.R. 2952).  On mental status examination, she reportedly was mildly anxious and mildly depressed with congruent mood (A.R. 2953).  Her medications were continued (A.R. 2953).  She also presented for therapy the same day and was assessed with a GAF of 75

///
///
///
///

(A.R. 2963-64).[14]  At a session the next month, Plaintiff's therapist again assessed a GAF of 75 (A.R. 2997).

In March of 2015, Plaintiff reported to Dr. Lewis that she was experiencing excessive sweating and nightmares with difficulty sleeping (A.R. 3024-25).  Dr. Lewis prescribed Trazodone for sleep at Plaintiff's next visit in April, where she reportedly had a normal mental status examination except for mildly depressed mood (A.R. 3075-76).

In May and June of 2015, plaintiff again requested that Dr. Lewis prepare a letter for the Social Security Administration advising that she was not able to work due to her condition (A.R. 3086-87, 3097).  Dr. Lewis advised that he would fill out any paperwork sent by the Administration but would not write a separate letter (A.R. 3086).  Plaintiff had also requested a letter from her therapist stating why she was unable to work (A.R. 3128).  When she saw her therapist, Plaintiff reported that her mood was preventing her from working and she was anxious, irritable and mildly agitated (A.R. 3142).  Her

///
///
///
///

---

[14]   A GAF score of 71-80 indicates: "If symptoms are present, they are transient and expectable reactions to psycho-social stressors (e.g., difficulty concentrating after a family argument); no more than slight impairment in social, occupational, or school functioning (e.g., temporarily falling behind in schoolwork)."  See DSM, p. 34.

13

therapist assessed a current GAF of 65 (A.R. 3143).[15]

On June 26, 2015, Plaintiff reportedly again requested a letter from Dr. Lewis stating that she was under treatment and currently unable to work due to her diagnoses (A.R. 3153-54).  This time, Dr. Lewis indicated he would provide a letter, and a follow up notation states that a form was ready for pickup at the front desk (A.R. 3153-54).  Plaintiff's therapist also emailed Plaintiff on July 8, 2015, stating that a letter had been provided for her to pick up which stated that Plaintiff had been receiving treatment from him (A.R. 3166).  Plaintiff's therapist advised that any other information would have to come from Plaintiff's medical records (A.R. 3166).  The actual letters that Dr. Lewis and Plaintiff's therapist reportedly provided to Plaintiff are not in the Administrative Record.[16]

Plaintiff returned to Dr. Lewis in November of 2015, reporting back pain, ankle pain and concern that she might need surgery (A.R. 3488).  On mental status examination, Plaintiff reportedly had slowed motor activity, somewhat depressed mood and congruent affect (A.R.

---

[15]   A GAF score of 61-70 indicates "[s]ome mild symptoms (e.g., depressed mood and mild insomnia) OR some difficulty in social, occupational, or school functioning (e.g., occasional truancy, or theft within the household), but generally functioning pretty well, has some meaningful interpersonal relationships."  See DSM, p. 34.

[16]   It appears that Dr. Lewis's letter may have been among the records reviewed by both ALJs.  See A.R. 44 (ALJ giving little weight to Dr. Lewis's opinion that "due to her condition she is not able to work," and citing an exhibit from "the CDR file"); A.R. 131 (prior ALJ also rejecting Dr. Lewis's referenced opinion).

3489).  Dr. Lewis continued Plaintiff's medications (A.R. 3489).  The same day, Plaintiff discussed with her therapist her physical ailments, disability claim and difficulty with finances, but she reportedly was alert, cooperative and pleasant and had appropriate engagement and expression with good insight and judgment (A.R. 3477). Her GAF was assessed at 75 (A.R. 3478).

At her therapy session in January of 2016, Plaintiff reported that she did not want to leave her room or talk to anybody, could not walk far because her leg hurt and she wore a brace, her mind was always racing, she had gone to the emergency room because she thought she was having a heart attack, her back hurt all the time, her doctors thought she has fibromyalgia, she had GERD, and she had an upcoming disability hearing (A.R. 3705).  Plaintiff reportedly appeared anxious and was making poor progress (A.R. 3705).  Her GAF was assessed at 65 (A.R. 3706).

Plaintiff returned to Dr. Lewis in March of 2016, reporting nightmares and a recent fibromyalgia diagnosis (A.R. 371-72). Plaintiff's mental status examination reportedly was normal except for slightly slowed motor activity and mildly anxious/depressed mood (A.R. 372).  Dr. Lewis lowered Plaintiff's Celexa dose (A.R. 372).

Plaintiff's next psychiatric session was in September of 2016, by telephone with Dr. Nadia Haddad (A.R. 4954-55).  Plaintiff had started Effexor on May 9, 2016, prescribed by her pain doctor (A.R. 4955). Plaintiff reported that she was not feeling better, had not been the same since she lost her baby, felt depressed, in pain, and was having

difficulty adjusting to life after the devastation of losing her job, house, fiancé and baby (A.R. 4955).  Plaintiff reported anxiety, palpitations, shortness of breath, dizziness, inability to think, frozen speech, panic attacks, nightmares, hearing things and seeing shadows passing (A.R. 4955).  On mental status examination, Plaintiff reportedly had psychomotor retardation, reduced vocal inflection, homicidal ideation and depressed and hopeless mood with congruent and constricted affect (A.R. 4956-57).  Dr. Haddad diagnosed major depressive disorder (severe), mild psychotic symptoms with panic and fibromyalgia (A.R. 4957).  Dr. Haddad increased Plaintiff's Effexor dose, discontinued Trazodone, continued Celexa, started melatonin and Benadryl, and recommended grief group psychotherapy and increased physical activity (A.R. 4958).

**B.    Treatment Records for Physical Conditions from the Alleged Onset Date through the State Agency Physicians' Review in October of 2016**

The record also reflects ongoing treatment with various providers for ankle pain/tibialis tendon tear/tendinosis following a car accident in 2009, lumbar and cervical radiculopathy, knee pain, carpal tunnel syndrome and right epicondylitis, for which Plaintiff was prescribed Flexeril, Mobic, Lidocaine ointment, splints, a CAM boot, a tennis elbow band and physical therapy.  See, e.g., A.R. 361-63, 1193-95, 1263, 1284, 1411-12, 1418, 1894, 1978-81, 2003-05, 2027-30, 2034-39, 2107, 2124-25, 2544, 2609-11, 3212-16, 3245-48, 3306-09, 3327-34, 3374-76, 3403-06, 3449-52, 3559-60 (treatment notes from April of 2009 through December of 2015).

The first treatment note following Plaintiff's alleged medical improvement in November of 2014 is an emergency room visit from July of 2015, when Plaintiff presented complaining of low back pain radiating to her left leg, for which she was given Toradol and referred to her primary doctor (A.R. 3212-16). Plaintiff followed up with Dr. Aggarwal in August of 2015 requesting a referral to a specialist for her back pain (A.R. 3245-46).

In September of 2015, Plaintiff consulted with Dr. Eckhardt Campos of Kaiser's Physical Medicine Department in regard to Plaintiff's back pain (A.R. 3306). On examination, Plaintiff reportedly had nonantalgic, narrow based gait without the cane she sometimes used, and also had tenderness to palpation and tenderness with range of motion (A.R. 3307-08). Dr. Campos diagnosed low back pain with some extension into the left lower extremity which was suspicious of myofascial syndrome (pain from spastic neck muscles) versus lumbar strain (A.R. 3308-09). Dr. Campos prescribed Flexeril, Mobic, Lidocaine ointment, weight loss, physical therapy and possible trigger point injections. Plaintiff returned for her first physical therapy appointment later in September (A.R. 3327-30).

Plaintiff also followed up in October of 2015 with her podiatrist regarding left ankle pain and swelling, which Plaintiff stated was getting worse (A.R. 3374). She was given a splint and told to continue taking Mobic as needed (A.R. 3375-76). Three of Plaintiff's physical therapy goals noted in October of 2015, were to be independent with a home exercise program, to be able to bend forward/squat to lift from the floor, and to tolerate 30 minutes of

standing to do housework without limitations before taking a break

(A.R. 3449).[17]


Plaintiff returned to Dr. Campos in November of 2015 (A.R. 3501).
At that time, she reportedly was exercising zero minutes per week
(A.R. 3513).  She stated that her pain was worse with prolonged
standing, that she had frequent intermittent numbness in both legs and
arms, she had widely diffuse pain in her shoulders and neck, and she
had right tennis elbow (A.R. 3501).  Her examination results were
consistent with her last visit with Dr. Campos (A.R. 3502-03).  Dr.
Campos ordered nerve conduction studies, stressed the importance of
weight loss, and continued Flexeril, Mobic and physical therapy, with
a note that Plaintiff could try trigger point injections, which she
declined (A.R. 3503-04).  Dr. Campos stated:

> At the end of the encounter, at checkout desk, patient
> inquires about a letter to [assist] her in re-establishing
> long-term disability through social security, which she
> states has previously secured.  (SSI)  I have not been
> involved in that past history and presently see no medically
> justifiable reason to argue for long-term disability that I
> am aware of.  I advise the patient such letters are not a
> KP-covered benefit and that she will need to seek out a
> Qualified Medical Examiner certified by the state of

---

[17]   Although Plaintiff reportedly had a "good" "rehab
potential" according to her physical therapist, she went to three
appointments and then was discharged from physical therapy in
December of 2015, because she did not return for scheduled
treatment (A.R. 3529-31).

1    California for just such purposes.

2

3    (A.R. 3501).[18]

4

5        In December of 2015, Plaintiff presented to Dr. Gerald Goodlow

6    complaining of numbness in both hands (A.R. 361-63).  A nerve

7    conduction study reportedly showed bilateral carpal tunnel syndrome

8    (A.R. 361-63).  Plaintiff tested negative for myalgias and neck pain

9    but positive for tingling in the hands and sensory deficits (A.R.

10   363).  Dr. Goodlow diagnosed mild carpal and ulnar neuropathy and

11   right lateral epicondylitis and skin numbness (A.R. 363).  Dr. Goodlow

12   referred Plaintiff for physical therapy, and ordered her to continue

13   ///

14   ///

15   ///

16   ———————————————

17       [18]    Dr. Campos subsequently wrote a note to Plaintiff's
     physical therapist which states:

18
         . . . In reviewing her chart, a few issues concern me
19       with regards to this patient previously seeking to get
         me to support her [c]ause to extend medically-
20       sanctioned permanent disability [t]hrough Social
         Security.  (I do not see how she secured this in the
21       first place).

22
         On the other hand, she has clearly dragged her feet
23       when it comes [t]o pursuing her end of the
         recommendations to loose [sic] weight, [v]isit
24       regularly with Physical Therapy and implement their
         recommendations, [o]r to try a series of offered
25       trigger-point injections (has declined this twice) for
         her very diffuse upper and lower back pains that she
26       describes as "severe."

27
     (A.R. 3528).  Dr. Campos apparently did not know that Plaintiff's
28   prior disability had been based on her mental condition.

wearing hand braces and a right tennis elbow band (A.R. 363).[19]  Dr.
Goodlow reported that he would "notify Dr. Campos to consider
fibromyalgia and a rheumatology referral," trigger point injections
and acupuncture (A.R. 363).  There are no records of any rheumatology
visits or any trigger point examination findings.

In January of 2016, Plaintiff spoke with Dr. Aggarwal, reporting
that she was on Social Security disability for major depression, and
requesting a "DMI or letter stating she [is] unable to work
permanently due to current medical conditions[.]  Reports severe
mental problem (major depression), generalized body pains, unable to
function at work, unable to walk or lift and recent MD office visit
stated possible fibromyalgia, she also states she is wearing a brace
which covers left foot, left ankle and left knee" (A.R. 3666).
Plaintiff reported that she already had letters from her psychiatrist
and therapist (A.R. 3666).  Dr. Aggarwal stated:

> Advised that I cannot write a letter for chronic disability
> but can write a temporary "DMI" as she is continuing to
> undergo [t]reatments by various specialists.  Requests I
> fill it out from when I last saw her [in October of 2015]
> until the beginning of March.  DMI written.

(A.R. 3666).  Dr. Aggarwal's office reportedly mailed the "DMI" to
Plaintiff (A.R. 3666).  Any "DMI" that Dr. Aggarwal completed for

---

[19]   Orthopedic surgeon Dr. Paul C. Liu subsequently
recommended carpal tunnel release surgery, and rated the chance
of helping at 95 percent (A.R. 363-64).

Plaintiff appears to be missing from the Administrative Record.[20]

On January 26, 2016, Plaintiff left a message at Kaiser requesting a letter stating that she is not able to stand for long periods of time, along with a diagnosis and a treatment plan (A.R. 3732).  On January 29, 2016, Plaintiff presented to podiatrist Dr. Anthony Kimball for evaluation of left ankle pain and swelling (A.R. 3762).  She reportedly was using shoe inserts, supportive shoes, ankle supports, Mobic and ice (A.R. 3762).  A left ankle MRI showed likely tenosynovitis, high grade chondrosis, small tibular joint effusion with fluid, small plantar calcaneal heel spur and small Haglund's deformity at the posterior superior calcaneus (A.R. 3766-67).

In February of 2016, Plaintiff presented to physical medicine Dr. Karen Keiko Murata for a second opinion regarding her lumbar radiculopathy, carpal tunnel syndrome and lateral epicondylitis (A.R. 3835).  Plaintiff reported that she had back pain radiating to her legs aggravated by walking, bending and standing less than five minutes (A.R. 3836).  On examination, she reportedly had a slow gait without her ankle brace/shoes, tenderness on palpation, and positive Tinel's and Phalen's tests (A.R. 3839-40).  Dr. Murata diagnosed chronic back pain radiating to the bilateral lower extremities with bilateral upper extremity paresthesias, bilateral carpal tunnel syndrome, and possible bilateral cervical and lumbar radiculopathy

---

[20]     Yet, the ALJ appears to have had a copy of Dr. Aggarwal's DMI.  See A.R. 44 (ALJ giving limited weight to Dr. Aggarwal's report that Plaintiff was "placed off work" from October 19, 2015 through March 1, 2016).

(A.R. 3840-41).  Dr. Murata prescribed a low back brace as needed, increased Plaintiff's Mobic, discontinued Flexeril, prescribed methocarbamal as needed, and ordered cervical, thoracic and lumbar MRI studies which showed degenerative disc disease of the lower cervical spine from C4-C5 through C6-C7 (A.R. 382-83, 3841-42).

Plaintiff followed up with Dr. Murata by telephone in March of 2016 (A.R. 367).  She reportedly had tried physical therapy and found the exercises "difficult to tolerate" (A.R. 367).  Plaintiff had declined acupuncture or local injection for pain (A.R. 368).  Dr. Murata referred Plaintiff to the Kaiser pain program (A.R. 368).

Plaintiff had requested that Dr. Murata complete a form for in home health services to help her with her activities of daily living due to pain (A.R. 377).  It is noted, "[a]t the end of appointment, patient does not want off work note but wants letter with [diagnoses] and Not able to work" (A.R. 368).  On March 22, 2016, Plaintiff called to state she would be faxing over a doctor statement to be completed by Dr. Murata for General Relief because she is unable to work, which she needed completed by March 30, 2016 (A.R. 365-66).  Dr. Murata completed a form and sent it to Plaintiff on or around March 25, 2016, indicated that Plaintiff had submitted two more types of forms, and asked that all future forms be sent through Kaiser's Insurance Department (A.R. 4202).  As with many of the other forms/letters referenced in the record, any form(s) Dr. Murata completed are absent

///

///

///

from the present Administrative Record.[21]

In April of 2016, Plaintiff presented for an initial pain psychologist assessment as part of Kaiser's integrated pain management program (A.R. 355-56). Plaintiff complained of chronic pain in her neck, shoulder, arms, hands, back, chest, hip, lower leg and ankle with numbness and tingling, increased with standing, walking, lifting, bending, twisting, weather changes, fatigue, stress and tension, and decreased by lying down, sleeping or resting (A.R. 356). Plaintiff reportedly was taking Tylenol #3, Relafen, Meloxicam, Flexeril, Robaxin, Trazodone, Celexa, Ativan and Imitrex (A.R. 356). She reportedly was not exercising (A.R. 357). Plaintiff admitted also using THC for pain in January of 2016, but agreed not to use it while working in a pain program (A.R. 357). Testing showed high Beck Depression Inventory with suicidal thoughts in the past two weeks, moderate opioid risk score due to her age, anxiety and depression, and presentation consistent with chronic pain (A.R. 357-58).

Plaintiff had a physical therapy evaluation in April of 2016 (A.R. 346). She said she had upper back pain radiating to her low back and extremities with tingling (id.). An MRI of her spine reportedly showed disc osteophytes with mild spinal stenosis (A.R.

---

[21]   Yet, it appears that the record reviewed by both ALJs did include an opinion from Dr. Murata. See A.R. 44 (ALJ giving little weight to Dr. Murata's opinion that Plaintiff was unable to work due to chronic thoracic and lumbar pain, fibromyalgia, bilateral carpal tunnel syndrome, cervical and lumbar radiculopathy, and right lateral epicondylitis, and citing an exhibit from "the CDR file"); A.R. 131 (prior ALJ giving no weight to Dr. Murata's opinion as based on Plaintiff's physical impairments, which the prior ALJ declined to consider).

346).  Plaintiff's goals included improving gait tolerance to one hour
and improving sitting tolerance to two hours (A.R. 346).  Plaintiff
reported that she could stand for up to 10 minutes, walk for up to 10
minutes, sit for up to 15 minutes, and sleep for up to six hours at
one time (A.R. 348).  She reported that she did not drive and did not
do any household chores (A.R. 348; see also A.R. 353-54 (Plaintiff
reporting to another provider that she did zero exercise)).

   In May of 2016, Plaintiff consulted with Dr. Chakradhar Penta for
pain management, at which time Plaintiff showed signs of depression
and was nervous/anxious (A.R. 341).  Plaintiff reported suffering from
chronic pain for the past five years (A.R. 342).  Plaintiff had
declined carpal tunnel release surgery and trigger point injections,
and claimed that physical therapy had not helped (A.R. 342-43).
Plaintiff reported that standing more than five minutes, walking more
than 10 minutes, sitting more than five minutes, bending, twisting,
fatigue, stress and tension increased her pain, and lying down/
sleeping/resting decreased her pain (A.R. 342-43).  Plaintiff wore
wrist splints most days, and previously had used a back brace (A.R.
343).  Plaintiff had used marijuana for pain four months prior, and
was interested in using it again since there were no reported side
effects (A.R. 344).  On examination, Plaintiff reportedly had a
depressed mood, stiff gait, and tenderness to palpation along the
axial spine and at some trigger points (A.R. 344).  Dr. Penta
diagnosed chronic pain syndrome, myofascial pain syndrome,
cervicogenic headache and fibromyalgia (A.R. 344).  Plaintiff was
encouraged to continue with physical therapy to build a tolerance to
activity, to pace activities to prevent flares, to take prescribed

medications (Effexor, Celexa, lidocaine ointment, Relafen and
Robaxin), and to postpone resuming medical marijuana while she tried
other pain medicine options (A.R. 344-45).  Dr. Penta noted that
trigger point injections in the bilateral upper trapezius might be
needed in the future (A.R. 345).

At a follow up physical therapy appointment in May of 2016,
Plaintiff reported that she was "doing ok," and she was prescribed a
TENS unit (A.R. 640-42).  Plaintiff thereafter attended 12 pain
management classes and group cognitive behavioral therapy sessions for
pain (A.R. 654-779).  On July 20, 2016, she was approved for 12 more
weeks of physical therapy and cognitive behavioral group therapy (A.R.
780-81).  She again reported that she did not drive and did no chores
(A.R. 783).  She was given a portable neck traction machine (A.R.
783).

Plaintiff returned to Dr. Penta in June of 2016, reporting
continuous, fluctuating pain, left knee "giving out," left arm
numbness, tightness in the bilateral trapezius, and lateral left hip
pain when she lies on that side (A.R. 690-91).  She also reported that
long sitting or walking or any amount of exercise bothered her left
side but she was walking "some" (A.R. 691).  Dr. Penta prescribed
Effexor in addition to the other medications Plaintiff was taking
(A.R. 691-93). Dr. Penta also prescribed a cane (A.R. 4718).

Plaintiff returned to Dr. Penta in August of 2016, reporting that
her pain was the same or slightly improved (A.R. 790).  Where
Plaintiff previously had reported doing no chores, she now reported

that she had been taking breaks with shopping and cleaning and was
delegating more work to her son (A.R. 791).  She reportedly also was
walking, using a cane for left foot pain as needed (A.R. 791).
However, she reported that she was unable to do a home exercise
program due to pain (A.R. 791).  Her medications were refilled and she
reportedly was "really interested" in trying marijuana again (A.R.
791-92).  She denied a trial of trigger point injections in favor of
physical therapy (A.R. 791).  On August 17, 2016, she reportedly was
stable on her current pain medications (A.R. 801).  In October of
2016, Plaintiff requested another referral for pain management after
she had been discharged from the program in September (A.R. 5045-46,
5057).

C.    **The State Agency Physicians' Opinions**

State agency review physicians examined Kaiser records received
in May of 2016, as well as the March, 2016 adverse decision which had
not considered Plaintiff's alleged physical impairments (A.R. 139-51).
These physicians opined in June/July of 2016 that Plaintiff was not
disabled (A.R. 139-51).  At that time, there reportedly were no
medical opinions in the record for the physicians to review (A.R.
145).  Dr. Stuart L. Laiken, M.D., Ph.D., found that for the period
beginning March 17, 2016 – the day after the first ALJ's adverse
decision – Plaintiff was capable of light work with occasional
postural activities, some bilateral upper extremity and left lower
extremity limitations, and some environmental limitations (A.R. 142,
145-47).  Dr. P.G. Hawkins, Ph.D., found for the same period that
Plaintiff was capable of performing simple tasks in a non-public

setting, finding no material change in Plaintiff's mental condition
since the first ALJ's adverse decision (A.R. 142-44, 147-49).

On reconsideration as of October of 2016, state agency review
physicians examined additional records from Kaiser received in
September of 2016, and again found Plaintiff not disabled (A.R. 167-
79). Plaintiff reportedly asserted that her fibromyalgia had worsened
and that, due to her left trochanteric bursitis, she has to use a cane
(A.R. 168, 170, 318). She was morbidly obese (A.R. 170). Again, the
state agency physicians had no medical opinions to review (A.R. 172).

D.   **Treatment Records Post-Dating the State Agency Physicians'
     Review**

Plaintiff returned to Dr. Haddad in October of 2016, reporting
feeling overwhelmed from taking care of her mother after her mother
had cataract surgery, and not knowing if there was any improvement
from the increased Effexor dose (A.R. 5074-75). She reportedly felt
she had no time for herself in the last month because she was
caretaking, and she was irritable, not enjoying life, having bad
migraines, not sleeping well with poor energy, felt unsettled and was
seeing shadows and hearing someone calling her name (A.R. 5075-76).
On mental status examination, she reportedly had psychomotor
retardation, reduced vocal inflection, normal thought content but
visual hallucinations, and a depressed, euthymic sustained emotional
state with congruent blunted dysphoric affect (A.R. 5076-77). Dr.
Haddad increased Plaintiff's Effexor, discontinued Benadryl,
prescribed Hydroxyzine, discontinued Celexa, continued melatonin and

again recommended increased activity (A.R. 5078). When Plaintiff returned for therapy with a new therapist on October 20, 2016, she reportedly was negative, angry and depressed (A.R. 5099). She was assessed with a GAF of 51-60, and the highest GAF in the last 12 months was estimated at 55 (A.R. 5100).

Plaintiff returned to Dr. Haddad in November of 2016, reporting that she felt overworked from caring for her mother (A.R. 5214-16). She was still feeling depressed, still seeing shadows, still hearing things, and anxious with constant worrying that bad things would happen after Social Security was taken away (A.R. 5216). She was set to start grief counseling the next week (A.R. 5216). On mental status examination, she reportedly had mild motor retardation, reduced vocal inflection, coherent yet vague thought processes, difficulty answering questions with specificity, auditory misperceptions with mild paranoia intermittently, visual misperceptions, inability to do serial 7s, and she was anxious and irritable with depressed mood and congruent blunted affect (A.R. 5217). Dr. Haddad prescribed Seroquel for sleep, continued Effexor, discontinued Hydroxyzine, continued melatonin and recommended increased physical activity (A.R. 5218-19).

Plaintiff restarted physical therapy in November of 2016, for her chronic low back pain, with a long term goal of tolerating prolonged standing for 30 minutes at a time to take a shower, tolerating sitting 30 minutes at a time and tolerating walking 30 minutes at a time (A.R. 5303). Her "rehab potential" was "fair" (A.R. 5303). Plaintiff asserted that lying down, sitting or standing too long aggravated her pain, and said she could sit less than 20 minutes at a time, stand

less than 10 minutes at a time and walk less than five minutes before hurting (A.R. 5304).

The record includes subsequent treatment notes for Plaintiff's ailments as follows: (1) regular medication visits with Dr. Haddad through May of 2017, which included increasing Plaintiff's Seroquel dose and adding Wellbutrin (A.R. 5406-10, 5531-34, 5613-16, 5677-80, 5759-63, 5863-66); (2) psychotherapy from February through July of 2017, during which time Plaintiff's GAF was assessed at 51-60 (A.R. 5666-67, 5701-02, 5719-20, 5837-38, 5923-24, 5990-91); (3) treatment from a new psychiatrist in July and November of 2017, which included increasing Plaintiff's Effexor dose (A.R. 6002-08, 6435-41); (4) psychotherapy with a new therapist from August though November of 2017 (A.R. 6117-18, 6160-61, 6190-91, 6230, 6410-11); (5) physical therapy through February of 2017, when Plaintiff was discharged to do a home exercise program (A.R. 5389-92, 5646-48); (6) one physical therapy visit in June of 2017, and a discharge from physical therapy in October of 2017, because Plaintiff failed to return for treatment (A.R. 5909-12, 5915); (7) pain management visits in October and November of 2017 (A.R. 6260-65, 6344-48); and (8) treatment for her ankle pain from April through August of 2017 (A.R. 5787-89, 5847-49, 6026-28).  Dr. Murata reportedly also completed a General Relief form on December 29, 2017, marking "permanent incapacity" (A.R. 6565-66). This form is not in the Administrative Record.

///
///
///
///

II.  **Substantial Evidence Does Not Support the Conclusion that Plaintiff No Longer was Disabled on and after November 1, 2014.**

Substantial evidence does not support the Administration's decision that Plaintiff medically improved as of November 1, 2014, to the point where she could perform light work then and thereafter.  In vacating the ALJ's March 16, 2016 decision, the Appeals Council ruled that there was no support for the residual functional capacity the ALJ had adopted for the period November 1, 2014 to March 16, 2016 (A.R. 54).  On remand, the new ALJ purported to adopt the non-examining state agency physicians' October, 2016 opinions in finding that Plaintiff's disability ended as of November 1, 2014 (A.R. 32, 37-44). However, these state agency physicians' opinions applied to the period beginning in March of 2016 at the earliest.  See A.R. 173 (indicating physical residual functional capacity was for the period from March 17, 2016 to the present); A.R. 175 (indicating mental residual functional capacity was for the period from March 12, 2016 to the present).

There is evidence suggesting that Plaintiff's mental condition did improve September, 2014 - February, 2015 (A.R. 2696-98, 2963-64). See A.R. 42 (ALJ discussing evidence).  However, there is no evidence from a medical source to support the ALJ's decision that Plaintiff's condition, which also included severe physical impairments, improved as of November 1, 2014 to the point of non-disability.  The record is devoid of any medical source statement determining that Plaintiff had the residual functional capacity the ALJ assessed from November 1, 2014 through March of 2016.  Further, the only medical opinions

regarding this time period that are included in the record (which are
the prior non-examining opinions as to which the first ALJ declined to
give great weight) reportedly were contradicted by the treating
opinions of Drs. Lewis, Murata, or Aggarwal (which are missing from
the record) (A.R. 43-44).

Given the lack of any medical source statements covering the
period from November 1, 2014 through March of 2016, and the reported
contradiction between the non-examining opinions and Plaintiff's
missing treating source opinions, the Court cannot find that the non-
examining state agency physicians' opinions are substantial evidence
to support the new ALJ's decision. Compare Tonapetyan v. Halter, 242
F.3d 1144, 1149 (9th Cir. 2001) (opinion of non-examining physician
"may constitute substantial evidence when it is consistent with other
independent evidence in the record"); see also Andrews v. Shalala, 53
F.3d 1035, 1041 (9th Cir. 1995) (where the opinions of non-examining
physicians do not contradict "all other evidence in the record" an ALJ
properly may rely on these opinions); Curry v. Sullivan, 925 F.2d
1127, 1130 n.2 (9th Cir. 1990) (same).

The ALJ also cited to medical recommendations from Plaintiff's
treatment providers (i.e., "reconditioning with daily aerobic
activities" recommended by Dr. Penta (A.R. 345), and "increased
physical activity" recommended by Dr. Haddad (A.R. 5692)). According
to the ALJ, these recommendations suggested that Plaintiff was capable
of a reduced range of light work and that her physical impairments "do
not preclude all activity." See A.R. 41. Plaintiff has never
asserted that her impairments preclude all activity. Further,

recommendations for Plaintiff to increase her activity from virtual inactivity do not constitute substantial evidence to support the ALJ's lay conclusion that Plaintiff can perform light work.  The ALJ was not qualified to draw such a conclusion from these sparse references in the voluminous medical record.  An ALJ cannot properly rely on the ALJ's own lay knowledge to make medical interpretations of examination results or to determine the severity of medically determinable impairments.  See Tackett v. Apfel, 180 F.3d 1094, 1102-03 (9th Cir. 1999); Balsamo v. Chater, 142 F.3d 75, 81 (2d Cir. 1998) (an "ALJ cannot arbitrarily substitute his [or her] own judgment for competent medical opinion") (internal quotation and citation omitted); Rohan v. Chater, 98 F.3d 966, 970 (7th Cir. 1996) ("ALJs must not succumb to the temptation to play doctor and make their own independent medical findings"); Day v. Weinberger, 522 F.2d 1154, 1156 (9th Cir. 1975) (an ALJ is forbidden from making his or her own medical assessment beyond that demonstrated by the record).  Absent expert medical assistance, the ALJ could not competently translate the medical evidence in this case into a residual functional capacity assessment.  See Tackett v. Apfel, 180 F.3d at 1102-03 (ALJ's residual functional capacity assessment cannot stand in the absence of evidentiary support).

Rather than making his own lay assessment of Plaintiff's limitations, the ALJ should have requested clarification from Plaintiff's treatment providers regarding Plaintiff's limitations, or ordered examination and evaluation of Plaintiff by consultative examiner(s).  See Day v. Weinberger, 522 F.2d at 1156; see also Reed v. Massanari, 270 F.3d 838, 843 (9th Cir. 2001) (where available medical evidence is insufficient to determine the severity of the

claimant's impairment, the ALJ should order a consultative examination
by a specialist); <u>accord</u> <u>Kish v. Colvin</u>, 552 Fed. App'x 650 (2014);
<u>see generally</u> <u>Mayes v. Massanari</u>, 276 F.3d 453, 459-60 (9th Cir. 2001)
(ALJ's duty to develop the record further is triggered "when there is
ambiguous evidence or when the record is inadequate to allow for the
proper evaluation of the evidence") (citation omitted); <u>Brown v.</u>
<u>Heckler</u>, 713 F.2d 441, 443 (9th Cir. 1983) ("[T]he ALJ has a special
duty to fully and fairly develop the record to assure the claimant's
interests are considered.  This duty exists even when the claimant is
represented by counsel.").


The ALJ also referenced certain medical examination reports and
Plaintiff's daily activities since November 1, 2014, as supposedly
proving that depression would not preclude the performance of full
time work (A.R. 38 (citing Exhibit 7E, CDR file); <u>see also</u> A.R. 43
(discussing daily activities of driving, taking her son to and from
school, and reports in the medical record that Plaintiff exercised,
regularly attended church, appeared to take pride in her appearance,
and went to an event over a weekend)).  The Administrative Record does
not contain the function statement(s) on which the ALJ reportedly
relied.  <u>See</u> Footnote 7, <u>supra</u>.[22]

///

---

[22]    Plaintiff testified at the February, 2018 hearing that
her activities of daily living included doing no chores, watching
television, going to stores once a month, paying bills, going to
doctor appointments, and getting her nails done once a month
(A.R. 77-79).  Plaintiff testified at the February, 2016 hearing
that she watched television, made quick meals (sandwiches,
microwave food), could not make her bed, could not clean her room
and did not want to do anything (A.R. 106-07).

The generality of the ALJ's findings, the lack of any medical source statements for the relevant time periods and the many referenced documents' absence from the Administrative Record prevent the Court from concluding that substantial evidence supports the decision Plaintiff medically improved as of November 1, 2014 and was no longer disabled then and thereafter.

**III. Remand is Appropriate**

The Court is unable to conclude that the ALJ's errors were harmless.  "[A]n ALJ's error is harmless where it is inconsequential to the ultimate nondisability determination." Molina v. Astrue, 674 F.3d 1104, 1115 (9th Cir. 2012) (citations and quotations omitted); see Treichler v. Commissioner, 775 F.3d 1090, 1105 (9th Cir. 2014) ("Where, as in this case, an ALJ makes a legal error, but the record is uncertain and ambiguous, the proper approach is to remand the case to the agency"); cf. McLeod v. Astrue, 640 F.3d 881, 887 (9th Cir. 2011) (error not harmless where "the reviewing court can determine from the 'circumstances of the case' that further administrative review is needed to determine whether there was prejudice from the error").

Remand is appropriate because the circumstances of this case suggest that further development of the record and further administrative review could remedy the ALJ's errors.  See McLeod v. Astrue, 640 F.3d at 888; see also INS v. Ventura, 537 U.S. 12, 16 (2002) (upon reversal of an administrative determination, the proper course is remand for additional agency investigation or explanation,

34

1  except in rare circumstances); <u>Leon v. Berryhill</u>, 880 F.3d 1041, 1044

2  (9th Cir. 2017) (reversal with a directive for the immediate

3  calculation of benefits is a "rare and prophylactic exception to the

4  well-established ordinary remand rule"; <u>Dominguez v. Colvin</u>, 808 F.3d

5  403, 407 (9th Cir. 2015) ("Unless the district court concludes that

6  further administrative proceedings would serve no useful purpose, it

7  may not remand with a direction to provide benefits"); <u>Treichler v.</u>

8  <u>Commissioner</u>, 775 F.3d at 1101 n.5 (remand for further administrative

9  proceedings is the proper remedy "in all but the rarest cases");

10 <u>Garrison v. Colvin</u>, 759 F.3d 995, 1020 (9th Cir. 2014) (court will

11 credit-as-true medical opinion evidence only where, <u>inter alia</u>, "the

12 record has been fully developed and further administrative proceedings

13 would serve no useful purpose"); <u>Harman v. Apfel</u>, 211 F.3d 1172, 1180-

14 81 (9th Cir.), <u>cert. denied</u>, 531 U.S. 1038 (2000) (remand for further

15 proceedings rather than for the immediate payment of benefits is

16 appropriate where there are "sufficient unanswered questions in the

17 record"); <u>see also</u> <u>Brown-Hunter v. Colvin</u>, 806 F.3d 487, 495-96 (9th

18 Cir. 2015) (discussing the narrow circumstances in which a court will

19 order a benefits calculation rather than further proceedings).  There

20 remain significant unanswered questions in the present record.[23]

21 ///

22 ///

23 ///

24 ///

25

26 ⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯

       [23]    For example, it is not clear whether the ALJ would be
27 required to find Plaintiff disabled for the entire claimed period
   of disability even if Dr. Mahta's opinions were fully credited.
28 <u>See</u> <u>Luna v. Astrue</u>, 623 F.3d 1032, 1035 (9th Cir. 2010).

**CONCLUSION**

For all of the foregoing reasons,[24] Plaintiff's and Defendant's motions for summary judgment are denied and this matter is remanded for further administrative action consistent with this Opinion.

LET JUDGMENT BE ENTERED ACCORDINGLY.

DATED: May 20, 2020.

                                    /s/
                            CHARLES F. EICK
                    UNITED STATES MAGISTRATE JUDGE

---

[24]   The Court has not reached any other issue raised by Plaintiff except insofar as to determine that reversal with a directive for the immediate payment of benefits would not be appropriate at this time.